United States District Court
Southern District of Texas

**ENTERED**

March 29, 2016

David J. Bradley, Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| ALYSON D. HOYLE, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. 4:15-cv-00347 |
| | § | |
| CAROLYN W. COLVIN, Acting | § | |
| Commissioner of Social Security | § | |
| Administration, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND ORDER ON CROSS-MOTIONS
## FOR SUMMARY JUDGMENT

Plaintiff Alyson D. Hoyle ["Hoyle"] brings this action pursuant to the Social Security

Act, 42 U.S.C. 405(g), seeking judicial review of a final decision by Defendant Carolyn W.

Colvin, Acting Commissioner of the Social Security Administration ["Commissioner"], denying

her application for disability insurance benefits. (Complaint, Docket Entry No. 1). The parties

have consented to proceed before a United States magistrate judge for all purposes, including the

entry of a final judgment, under 28 U.S.C. § 636(c). (Docket Entry No. 12). Before the court are

the parties' cross-motions for summary judgment and supporting memoranda. (Defendant's

Cross-Motion for Summary Judgment ["Defendant's Motion"], Docket Entry No. 8;

Memorandum in Support of Defendant's Cross-Motion for Summary Judgment ["Defendant's

Memorandum"], Docket Entry No. 8-1; Motion for Summary Judgment ["Plaintiff's Motion"],

Docket Entry No. 9; Memorandum of Law in Support of Plaintiff's Motion for Summary

Judgment ["Plaintiff's Memorandum"], Docket Entry No. 10). Defendant has responded in

opposition to Plaintiff's motion.  (Defendant's Reply to Plaintiff's Cross-Motion for Summary Judgment ["Defendant's Response"], Docket Entry No. 11).

After considering the pleadings, the evidence submitted, and the applicable law, Defendant's motion is GRANTED, and Plaintiff's motion is DENIED.

## I. Background

Hoyle filed an application for disability insurance benefits ["DIB"], under Title II of the Social Security Act ["the Act"], on January 31, 2013.  (Transcript, Docket Entry No. 6, at 11, 155-66).  In her application, Hoyle claimed that she had been unable to work since May 12, 2011,[1] due to a "lumbar spine impairment," "severe back pain," degenerative disc disease," and "hypertension."  (Tr. 211, 235).  The Commissioner denied Plaintiff's application on March 27, 2013, and, again, upon reconsideration, on May 24, 2013.  (Tr. 80-106, 141-44, 147-49).  Plaintiff then successfully requested a hearing before an administrative law judge ["ALJ"].  (Tr. 150-51).  That hearing took place on April 15, 2014, before ALJ Janis Estrada.  (Tr. 27-57).  Plaintiff appeared and testified at the hearing, accompanied by her non-attorney representative, Nicholas Monroe.  (Tr. 31-47).  The ALJ also heard testimony from a vocational expert, Cassandra Humfress, and a medical expert, Dr. Nancy M. Terran.  (Tr. 47-57).

Following the hearing, the ALJ engaged in the following five-step, sequential analysis to determine whether Hoyle was disabled:

1. An individual who is working or engaging in substantial gainful activity will not be found disabled regardless of the medical findings.  20 C.F.R. §§ 404.1520(b) and 416.920(b).

2. An individual who does not have a "severe impairment" will not be found to be disabled.  20 C.F.R. §§ 404.1520(c) and 416.920(c).

---

1. Hoyle had previously applied for DIB in June 2010.  (Tr. 70).  That application was denied by an ALJ on May 11, 2011.  (*Id.*).  Therefore, *res judicata* dictates that her alleged onset date cannot precede May 12, 2011.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will not be considered disabled without consideration of vocational factors. 20 C.F.R. §§ 404.1520(d) and 416.920(d).

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made. 20 C.F.R. §§ 404.1520(e) and 416.920(e).

5. If an individual's impairment precludes performance of his past work, then other factors, including age, education, past work experience, and residual functional capacity, must be considered to determine if any work can be performed. 20 C.F.R. §§ 404.1520(f) and 416.920(f).

*Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000); *Martinez v. Chater*, 64 F.3d 172, 173-74 (5th Cir. 1995); *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991); *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991); *Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988). It is well-settled that, under this analysis, Hoyle has the burden to prove any disability that is relevant to the first four steps. *Wren*, 925 F.2d at 125. If she is successful, the burden then shifts to the Commissioner, at step five, to show that she is able to perform other work that exists in the national economy. *Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir. 2001); *Wren*, 925 F.2d at 125. "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis." *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

An individual claiming DIB under the Act has the burden to prove that she suffers from a disability. *See Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988); *Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir. 1985). The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than twelve months." *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990) (citing 42 U.S.C. § 423(d)(1)(A)). "Substantial gainful activity" is defined as "work activity involving significant physical or mental abilities for pay or profit." *Newton*, 209

3

F.3d at 452.  A "physical or mental impairment" is "an impairment that results from anatomical, physiological or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  *Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983) (citing 42 U.S.C. § 423(d)(3)).  The impairment must be so severe as to limit the claimant so that she "is not only unable to do h[er] previous work but cannot, considering h[er] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).  It must be stressed that the mere presence of an impairment is not enough to establish a disability under the Act.  *See Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) (quoting *Milam v. Bowen*, 782 F.2d 1284, 1286 (5th Cir. 1986)).  Rather, a claimant is disabled only if she is "incapable of engaging in substantial gainful employment."  *Id.*

Based on these principles, as well as her review of the evidence presented at the hearing, the ALJ determined that Plaintiff "ha[d] not engaged in substantial gainful activity since May 12, 2011."  (Tr. 13 ¶ 2).  The ALJ further concluded that Hoyle suffered from lumbar degenerative disc disease, psoriatic arthritis, iron deficiency anemia, depression, anxiety not otherwise specified ["NOS"], and obesity.  (*Id.* at ¶ 3).  Although she determined that these impairments, alone or in combination, were severe, she concluded, ultimately, that Plaintiff's impairments did not meet, or equal in severity, the medical criteria for any disabling impairment in the applicable SSA regulations.[2]  (Tr. 14-16 ¶ 4).  The ALJ also found that Plaintiff suffered from hypertension, sleep apnea, hyperlipidemia, and insomnia, but determined that those conditions were not severe. (Tr. 13-14 ¶ 3).  Drawing from the evidence, the ALJ concluded that Hoyle had the residual functional capacity ["RFC"] to perform sedentary work, subject to certain limitations.  (Tr. 16 ¶

---

2.  A claimant is presumed to be "disabled" if her impairments meet, or equal in severity, a condition that is listed in the appendix to the Social Security regulations.  *Falco v. Shalala*, 27 F.3d 160, 162 (5th Cir. 1994).

5).  In particular, the ALJ found that Hoyle cannot climb ropes, ladders, or scaffolds; that she cannot be "expos[ed] to dangerous machinery and unprotected heights;" and that she can only occasionally "balanc[e], stoop[], kneel[], crouch[], crawl[], and climb[] ramps and stairs."  (*Id.*). She also found that Hoyle is unable to understand, remember, and carry out complex work.  (*Id.*). Ultimately, however, the ALJ determined that Hoyle's physical and mental impairments do not preclude her from returning to her past relevant work as a "filing clerk," a "finance manager," and a "claims clerk."  (Tr. 21).  For that reason, the ALJ concluded that Hoyle was not disabled, within the meaning of the Act, and she denied her applications for benefits.  (Tr. 22).

On July 21, 2014, Plaintiff requested an Appeals Council review of the ALJ's decision. (Tr. 7).  SSA regulations provide that the Appeals Council will grant a request for a review if: (1) "there is an apparent abuse of discretion by the ALJ;" (2) "an error of law has been made;" (3) "the ALJ's action, findings, or conclusions are not supported by substantial evidence;" or (4) "there is a broad policy issue which may affect the public interest."  20 C.F.R. §§ 404.970 and 416.1470.  On December 9, 2014, the Appeals Council denied Hoyle's request, finding that no applicable reason for review existed.  (Tr. 1-6).  With that ruling, the ALJ's decision became final.  *See* 20 C.F.R. §§ 404.984(b)(2) and 416.1484(b)(2).  On February 6, 2015, Plaintiff filed this lawsuit, pursuant to section 205(g) of the Act (codified as amended at 42 U.S.C. § 405(g)), to challenge that decision. (Complaint, Docket Entry No. 1).  Subsequently, the parties filed cross-motions for summary judgment.  Having considered the pleadings, the evidence submitted, and the applicable law, the court concludes that Defendant's motion should be granted, and that Plaintiff's motion should be denied.

## II. Standard of Review

In social security disability cases, the court's review is limited to determining: "(1) whether substantial evidence supports the Commissioner's decision[;] and (2) whether the Commissioner's decision comports with relevant legal standards." *Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999) (citing *Brock v. Chater*, 84 F.3d 726, 727 (5th Cir. 1996)). "Substantial evidence" is relevant evidence that a reasonable mind might accept as adequate to support a conclusion. *Copeland v. Colvin*, 771 F.3d 920, 923 (5th Cir. 2014); *Audler v. Astrue*, 501 F.3d 446, 447 (5th Cir. 2007) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). It is "more than a mere scintilla and less than a preponderance." *Copeland*, 771 F.3d at 923; *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000). "In determining whether substantial evidence of disability exists, th[e] court weighs four factors: (1) objective medical evidence; (2) diagnoses and opinions; (3) the claimant's subjective evidence of pain and disability; and (4) the claimant's age, education, and work history." *Perez*, 415 F.3d at 462.

In applying the "substantial evidence" standard on review, the court must scrutinize the record to determine whether such evidence is present. *Id.* at 461; *Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir. 2001); *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994). But the court may not "reweigh the evidence in the record nor try the issues *de novo*, nor substitute [its] judgment for that of the [Commissioner], even if the evidence preponderates against the [Commissioner]'s decision." *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988); *Copeland*, 771 F.3d at 923; *see Perez*, 415 F.3d at 461 ("Conflicts of evidence are for the Commissioner, not the courts, to resolve."). "If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed." *Perez*, 415 F.3d at 461 (citing *Richardson*, 402 U.S. at 390).

6

"A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision." *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001) (quoting *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir. 2000)).

## III. Discussion

Plaintiff challenges the ALJ's findings on four grounds.  First, Hoyle argues that the ALJ erred, because she failed to "properly weigh" the medical opinions from her treating physicians, Dr. Yi-Chun Chou and Dr. Thomas N. Masciangelo.  (Pl.'s Mem. 13).  Specifically, Plaintiff contends that the ALJ rejected those opinions without "good cause" to do so, and that she failed to appropriately evaluate the opinions under the multi-factor analysis set out in 20 C.F.R. § 404.1527(c).  (*Id.* at 13-16).  Next, Plaintiff challenges the RFC determination made by the ALJ, claiming that it "d[oes] not include a narrative of any specific medical or nonmedical facts that support [it]."  (*Id.* at 16-17).  Third, Plaintiff contends that the ALJ erred in her assessment of her credibility.  (*Id.* at 17-19).  Plaintiff contends, in particular, that the ALJ "fail[ed] to cite any medical authority that the lack of particular physical findings are incompatible with [] Hoyle's disabling medical conditions."  She also complains that the ALJ relied on irrelevant evidence to support that credibility finding.  (*Id.* at 18).  Finally, Plaintiff argues that the ALJ's step five determination is not supported by substantial evidence, because she erred in determining her RFC.  (*Id.* at 26-27).  In addition, Plaintiff contends that, in posing hypothetical questions to the vocational expert witness, the ALJ "failed to accurately describe all of [her] mental limitations." (*Id.* at 20).  Defendant insists, however, that the ALJ properly considered all of the available evidence, and followed the applicable law, in determining that Plaintiff is not disabled.  (Def.'s Mem. 4-12).

### *Medical Facts, Opinions, and Diagnoses*

The earliest medical records show that, on March 7, 2011, Hoyle sought treatment from a family practitioner, Dr. Shubha P. Shetty, at the Strawberry Health Center in Houston, Texas. (Tr. 619-20).  Hoyle complained of psoriatic arthritis, insomnia, anxiety, and sleep apnea.  (Tr. 619).  Plaintiff reported that she also suffered from hypertension and dyslipidemia, but denied any symptoms relating to those conditions.  (*Id.*).  Her weight on that date was 207 pounds, and her blood pressure was 109/66.  (*Id.*).  Dr. Shetty examined Plaintiff, and observed no abnormalities.  (Tr. 619-20).  Hoyle was prescribed Lisinopril for her hypertension, Zolpidem for her insomnia, Citalopram for her anxiety, and Pravastatin for her hyperlipidemia.  (Tr. 620).  She was also referred to a psychiatrist and a rheumatologist.  (*Id.*).

Approximately seven weeks later, on April 27, 2011, Hoyle was seen by Dr. Hong L. Truong also at the Strawberry Health Center, complaining of a "sharp" pain in the left lower quadrant of her abdomen, as well as a mild fever.  (Tr. 617-18).  Hoyle stated that her symptoms had begun two weeks before.  (Tr. 617).  She stated that her abdominal pain worsened with eating.  (*Id.*).  Plaintiff reported a history of diverticulosis and constipation, stemming from a 2008 colonoscopy.  (*Id.*).  Dr. Truong prescribed Ciprofloxacin and Metronidazole.  (Tr. 618).  He advised Hoyle to follow-up with her primary care physician.  (*Id.*).

On May 4, 2011, Hoyle returned to Dr. Shetty for a hypertension evaluation.  (Tr. 615-16).  Her weight was then 219 pounds and her blood pressure was 118/73.  (Tr. 615).  Hoyle reported that her psoriatic arthritis had improved with medication.  (*Id.*).  Plaintiff reported that she had been using continuous positive airway pressure ["CPAP"] to treat her sleep apnea since 2007, but complained that she was "still snor[ing] a lot."  (*Id.*).  During that visit, Hoyle was observed to have "a normal mood and affect."  (Tr. 616).  A physical examination revealed no

abnormalities.   (Tr. 615-16).   Plaintiff was prescribed Prevastatin, Lisinopril, Trazodone, and

Hydrocodone.  (Tr. 616).  She was referred to a sleep lab for further treatment.  (*Id.*).

On June 3, 2011, Hoyle was seen by Dr. Michelle Nazario, at the Strawberry Health

Center Psychiatry Clinic ["Strawberry Psychiatry Clinic"], for a mental health evaluation.  (Tr.

611-14).   Hoyle reported a history of sleep apnea, insomnia, hypertension, dyslipidemia,

spondylitis, depression, and anxiety.  (Tr. 611).  Plaintiff complained of increased depression and

residual anxiety over the past year, due to stress related to her family, marriage, finances, and

health.  (*Id.*).  She also complained that her Trazodone medication gave her "upsetting" dreams.

(*Id.*).  During that visit, Hoyle admitted to a "[d]epressed mood," "anhedonia," "difficulty falling

asleep," a "decreased appetite," "poor concentration," "crying frequently," "social withdrawal,"

"excessive worry," "obsessive ruminations," "sleep disturbance," "irritability," "chest tightness,"

and "forgetfulness."  (*Id.*).  Plaintiff also claimed to suffer from chest tightness, shortness of

breath, tachycardia, and palpitations.  (*Id.*).  Upon examination, Dr. Nazario found Plaintiff's

affect to be "[r]estricted, stable, appropriate, and of normal intensity," but her mood was said to

be "[d]epressed."  (Tr. 612).  Plaintiff was diagnosed as suffering from a major depressive

disorder and generalized anxiety disorder.  (Tr. 613).  She was prescribed two anti-anxiety

medications, Citalopram and Hydroxyzine, and was instructed to discontinue the Trazodone.

(*Id.*).

On June 4, 2011, Plaintiff went to the Sleep Disorders Center at LBJ General Hospital for

an evaluation of her sleep apnea.  (Tr. 322-27).  Hoyle complained of snoring, difficulty falling

asleep, nighttime awakenings, racing thoughts, and "dream-like images."  (Tr. 322).   She

reported that she typically slept for eleven hours each night.  (*Id.*).  A respiratory analysis study

revealed that Plaintiff's sleep apnea was "eliminated" with the use of a CPAP machine

9

pressurized at 10 centimeters H$_2$O.  (*Id.*).  During that visit, Hoyle was advised to continue using a CPAP machine, and to "attain and maintain ideal body weight."  (Tr. 323).  She was further advised to restrict her sleep to no more than eight hours each night.  (*Id.*).

On June 30, 2011, Hoyle sought treatment from Dr. Vikesh Khanijow at the LBJ General Hospital Rheumatology Clinic ["LBJ Rheumatology Clinic"].  (Tr. 316-21).  Hoyle complained of muscle fatigue, joint pain, and stiffness in her neck, shoulders, elbows, wrists, fingers, knees, and ankles.  (Tr. 316).  She reported that she had been diagnosed as suffering from psoriatic arthritis in November 2008.  (*Id.*).  Upon examination, Dr. Khanijow observed a "dry scaly rash" on Plaintiff's neck, left arm, and scalp, but found no evidence of synovitis.  (Tr. 317).  Hoyle exhibited a full range of motion in her shoulders, elbows, wrists, hands, hips, knees, ankles, and feet.  (*Id.*).  Her upper and lower extremities' strength levels were rated as "5/5."  (*Id.*).  X-rays of Plaintiff's lumbosacral spine revealed "[l]umbar spondylosis with degenerative disc disease from T11 through L4;" a "[m]ild bony encroachment with narrowing of neural foramina at L1/2 and T12/L1 bilaterally;" and "[f]acet osteoarthritis of T12/L1, L1/2[,] and L5/S1."  (Tr. 345-46).  Dr. Khanijow reported that he was "unsure" whether Hoyle had, in fact, received a diagnosis of psoriatic arthritis.  (Tr. 321).  He concluded that he "would like to further investigate."  (*Id.*).  Plaintiff was prescribed Methotrexate, Enbrel, and Tramadol, and was referred to a dermatologist for treatment of her psoriasis.  (*Id.*).

On August 8, 2011, Plaintiff saw Dr. Elizabeth H. David at the Strawberry Psychiatry Clinic.  (Tr. 609-10).  Plaintiff reported that, since her last visit, her mood was "brighter."  (Tr. 609).  She denied any recent panic attacks, and stated that her anxiety medication was "very helpful."  (*Id.*).  Dr. David examined Hoyle, and observed that her affect was "euthymic," her thoughts were "linear," and her cognitive abilities were "intact in social context."  (Tr. 610).

10

Hoyle was prescribed Citalopram, Zolpidem, and Trazodone. (*Id.*). She was advised to discontinue Hydroxyzine. (*Id.*).

On September 27, 2011, Hoyle returned to the LBJ Rheumatology Clinic. (Tr. 312-15). Plaintiff reported that her arthralgia had improved since her last visit. (Tr. 312). The treating physician, Dr. Geoffrey Konopka, observed a "small [one centimeter] healing lesion" on Hoyle's right lower abdomen, but found no evidence of synovitis or psoriatic rashes. (Tr. 315). He observed a full range of motion and strength in Plaintiff's shoulders, elbows, wrists, hands, hips, knees, ankles, and feet. (*Id.*).

On October 6, 2011, and November 2, 2011, Plaintiff returned to Dr. Truong at the Strawberry Health Center for routine checkups. (Tr. 601-04). Treatment notes from those visits are mostly unremarkable. They reveal no complaints of increased or persistent pain. On October 6, 2011, Plaintiff reported that her hypertension and hyperlipidemia symptoms had improved with medication. (Tr. 603). Her weight was said to be 229 pounds on that date, and her blood pressure was 119/69. (Tr. 604).

On November 28, 2011, Hoyle returned to the Strawberry Psychiatry Clinic for a follow-up appointment. (Tr. 599-600). Plaintiff complained of memory loss, attention problems, and fatigue. (Tr. 599). She reported that she had stopped taking the Trazodone, because it gave her "bad dreams" and caused her to "wake up angry." (*Id.*). She reported a "brighter" mood, no panic attacks, and no adverse side effects from her medications. (*Id.*). Plaintiff also stated that she had "started weekly counseling at her church." (*Id.*).

On January 24, 2012, Plaintiff was seen by Dr. Gloria Salazar at the LBJ Rheumatology Clinic. (Tr. 308-11). Dr. Salazar recorded that Hoyle was doing "well," aside from a recent "flare" of psoriatic arthritis due to an "improper administration of [E]nbrel." (Tr. 308, 310-11).

She advised Plaintiff to continue with her current medications. (Tr. 311).

Three days later, on January 27, 2012, Hoyle sought treatment from a family practitioner, Dr. Thomas N. Masciangelo, at the Gulfgate Health Center ["Gulfgate"] in Houston, Texas, for an acute respiratory infection. (Tr. 289-95). Hoyle reported a history of sleep apnea, psoriatic arthritis, spondylitis, hypertension, anxiety, and depression. (Tr. 292). She stated that her hypertension and psoriatic arthritis had improved with medication. (Tr. 294). Plaintiff also stated that she was "sleeping soundly for at least [six] hour[s] nightly" with the use of a CPAP machine. (*Id.*). Dr. Masciangelo examined Hoyle, and found no abnormalities. (Tr. 293). He prescribed Pravastatin, Lisinopril, and Azithromycin. (Tr. 291).

On February 20, 2012, Hoyle went back to the Strawberry Psychiatry Clinic for a routine examination. (Tr. 596-98). Plaintiff reported an improved mood, no irritability or panic attacks, and fewer "crying spells." (Tr. 596). She stated that she was still having unpleasant dreams, but that they had become "more tolerable." (*Id.*). During that visit, Plaintiff was found to have a "euthymic" affect, and a "calm and cooperative" demeanor. (Tr. 597).

On May 10, 2012, Hoyle sought treatment at the LBJ Rheumatology Clinic for increased joint pain and "skin flares." (Tr. 304-07). Plaintiff was found to have "mild psoriatic changes in the sole of the left foot;" "some scaling in the border of [her] right hairline;" and "tenderness in [the] lower lumbar spine." (Tr. 305). A bone density exam showed a slight vitamin D deficiency, but otherwise revealed no abnormalities. (Tr. 307). The results from Hoyle's lab work was also normal. (*Id.*).

On July 23, 2012, Hoyle returned to Dr. Masciangelo, complaining of progressively worsening short-term memory loss. (Tr. 282-88). An MRI of Plaintiff's brain showed "few T2 hyperintensities in the periventricular white matter," but otherwise revealed no abnormalities.

(Tr. 330). Hoyle's body mass index was 37.4. (Tr. 283). Dr. Masciangelo advised Plaintiff to lose weight, and he referred her to a neurologist. (Tr. 288).

One week later, on July 30, 2012, Hoyle presented to Dr. Benjamin T. Li at the Strawberry Psychiatry Clinic for a follow-up mental health examination. (Tr. 593-95). Hoyle reported constant fatigue, anxiety, and bouts of forgetfulness. (Tr. 593). She also claimed to have difficulty with concentration, but denied any recent incidents of depression, anhedonia, insomnia, or panic attacks. (*Id.*). Her affect was "mildly restricted" and her mood was "ok." (Tr. 594). Dr. Li prescribed Citalopram, Wellbutrin, and Trazodone. (Tr. 595).

On September 6, 2012, Hoyle sought treatment from Dr. Yi-Chun Chou at the LBJ Rheumatology Clinic. (Tr. 300-03). Plaintiff complained of increased pain and stiffness "all over" her body due to a recent two-week "road trip" with her husband. (Tr. 300). She admitted, however, that the pain and stiffness was "improving." (*Id.*). Upon examination, Dr. Chou observed "[m]inimal psoriasis lesion[s] [o]n the right anterior knee and scalp," as well as "[s]ome tenderness in the left index finger." (Tr. 301). She found no synovitis, and noted a full range of motion in Hoyle's shoulders, elbows, wrists, hands, hips, knees, ankles, and feet. (*Id.*). X-rays of Plaintiff's hands and wrists were unremarkable. (Tr. 302). A bone density exam showed "normal bone density of the lumbar spine." (*Id.*). Dr. Chou encouraged Hoyle to engage in "low impact exercises, such as swimming or walking." (Tr. 303).

Ten days later, on September 16, 2012, Dr. Chou completed a Medical Release/Physician's Statement on Plaintiff's physical limitations. (Tr. 705). On that form, Dr. Chou reported that Hoyle was completely unable to work, for at least six months, due to psoriatic arthritis. (*Id.*). Dr. Chou further limited Plaintiff to one hour of sitting, fifteen minutes of standing, thirty minutes of walking, thirty minutes of keyboarding, and a "minimum" amount of

bending or stooping, in an eight-hour workday.  (*Id.*).  Dr. Chou reported that Hoyle was completely unable to climb stairs or ladders, to kneel, to squat, to push, to pull, to lift, or to carry objects.  (*Id.*).

On September 24, 2012, Hoyle was again seen by Dr. Li at the Strawberry Psychiatry Clinic.  (Tr. 586-88).  Plaintiff complained that her memory "ha[d] not gotten better" since her last appointment.  (Tr. 586).  Dr. Li observed that Plaintiff's affect was "[m]ildly constricted," but found that her thought content, thought processing, cognition, insight, and judgment were within normal limits.  (Tr. 587).  Her lab work and brain MRI were both normal.  (Tr. 588). Plaintiff was given a Mini-Mental State Examination ["MME"] score of 29/30, with one point deducted for "delayed recall."  (Tr. 587).  She was prescribed Citalopram, Wellbutrin, and Trazadone.  (*Id.*).

Approximately three weeks later, on October 16, 2012, Hoyle went to the Gulfgate Health Center, complaining of breast pain, urinary incontinence, and GERD.  (Tr. 583-85).  A physical examination revealed no abnormalities.  (Tr. 585).  Her blood pressure was 139/79, and her weight was 241 pounds.  (*Id.*).  Plaintiff was prescribed Oxybutynin and Lansoprazole.  (*Id.*). She was advised to follow up with her primary care physician if her symptoms did not improve. (*Id.*).

Later that day, Hoyle attended a mental health counseling session at the Strawberry Psychiatry Clinic.  (Tr. 486-89).  She reported that she suffered from depression, anxiety, and low self-esteem.  (Tr. 488-89).  During that visit, her affect was "tearful," but her judgment, perception, and cognition were all within normal limits.  (Tr. 489).  She was given homework assignments to improve her self-esteem issues, and instructed to return to counseling in five months.  (*Id.*).

On October 31, 2012, Plaintiff saw a family practitioner, Dr. Diana Grair, with complaints of painful urination.  (Tr. 267-71).  Plaintiff's blood pressure was 121/66 and her BMI was 38.17.  (Tr. 267).  Dr. Grair recorded that Hoyle "appear[ed] well," and that she was "in no apparent distress."  (Tr. 270).  A urine culture was taken, and Plaintiff was instructed to return if her symptoms did not improve.  (Tr. 270-71).

On January 3, 2013, Hoyle sought treatment from Dr. Binh Y. Nguyen at the LBJ Rheumatology Clinic.  (Tr. 296-99).  During that visit, Hoyle complained of morning stiffness and pain in her lower back, hands, ankles, and feet, as well as numbness and tingling in her upper extremities.  (Tr. 296).  She stated that her psoriatic rash was "stable."  (*Id.*).  A physical exam, a bone density exam, x-rays, and lab work were all normal.  (Tr. 298).  Dr. Nguyen instructed Hoyle to continue taking her medications, and advised her to attempt lower back stretching exercises.  (Tr. 299).

Later that month, on January 25, 2013, Hoyle returned to Dr. Li.  (Tr. 579-81).  Hoyle complained of increasing fatigue, as well as "vivid dreams."  (Tr. 579).  She reported occasional feelings of frustration due to "minor stressors triggering her back into 'down' periods."  (*Id.*).  However, Hoyle also reported that "things [we]re going well," that her anxiety was "generally well controlled," and that she was engaging with activities outside the house, such as "helping her church with tax preparation."  (*Id.*).  Dr. Li observed that Hoyle's appearance, gait, attitude, psychomotor activity, speech, mood, affect, thought content, thought processing, cognition, insight, and judgment skills were all within normal limits.  (Tr. 580).  Dr. Li advised Plaintiff to continue taking her medications, and to follow up with him in two months.  (Tr. 581).

Four days later, on January 29, 2013, Plaintiff returned to the Strawberry Psychiatry Clinic for another therapy session.  (Tr. 577-78).  During that session, Hoyle discussed her

childhood, family background, and past experiences.  (Tr. 577).  Her affect was "appropriate,"
and her behavior was "pleasant, calm, and cooperative."  (*Id.*).  Plaintiff was instructed to return
for another therapy session in four months.  (Tr. 578).

On February 8, 2013, Plaintiff was again seen by Dr. Masciangelo.  (Tr. 762-69).  She
complained of lower back pain and requested a refill of her medications.  (Tr. 768).  A physical
examination and lab work revealed no abnormalities.  (Tr. 626).  Dr. Masciangelo recorded that
Plaintiff's memory problems were "likely secondary to sleep deprivation."  (Tr. 768).  He wrote
that her psoriatic arthritis was "doing well," due to the fact that she was "able to rest more
frequently without [the] stresses of job requirements."  (*Id.*).

Approximately three months later, on May 10, 2013, Dr. Masciangelo completed a
Multiple Impairment Questionnaire on Plaintiff's abilities.  (Tr. 685-91).  In that questionnaire,
Dr. Masciangelo reported that, due to psoriatic arthritis, hypertension, hyperlipidemia, and sleep
apnea, Plaintiff was limited, in an eight-hour day, to sitting continuously for one hour, to
standing continuously for one hour, and to walking continuously for one hour.  (Tr. 685, 687).
Dr. Masciangelo indicated that, due to hand pain and shoulder weakness, Plaintiff experienced
significant limitations with repetitive reaching, handling, fingering, and lifting.  (Tr. 688).  He
reported that Plaintiff was completely unable to lift or carry objects; to grasp, turn, or twist
objects; to use her fingers or hands for fine manipulations; or to reach with her arms.  (Tr. 688-
89).  He further reported that Plaintiff had difficulty keeping her neck in a constant position, and
that she could not push, pull, kneel, bend, or stoop, at all.  (Tr. 689-90).  Dr. Masciangelo
checked a series of boxes to indicate that Hoyle experienced "psychological limitations," as well
as vision problems, and that she must avoid "wetness," "noise," "fumes," "gases," "temperature
extremes," "humidity," "dust," and "heights."  (Tr. 690).  Dr. Masciangelo concluded that

16

Hoyle's symptoms were likely to increase if she were placed in a competitive work environment. (Tr. 689).  He estimated that Plaintiff's impairments would cause her to miss three or more days of work per month.  (Tr. 690).

In the interim, on May 2, 2013, Plaintiff returned to the LBJ Rheumatology Clinic, complaining of psoriatic arthritis and a muscle spasm in her back.  (Tr. 669-78).  Treatment notes from that visit reveal paraspinal muscle tenderness in Plaintiff's lumbar spine, and "[s]table mild psoriasis in [the] lower abdomen."  (Tr. 675).  No synovitis or new rashes were detected.  (*Id.*). Plaintiff exhibited a full range of motion and strength in all parts of her body.  (*Id.*).  She was instructed to continue lower back stretching exercises, as tolerated.  (Tr. 677).

Four days later, on May 6, 2013, Hoyle sought treatment from Dr. Li at the Strawberry Psychiatry Clinic.  (Tr. 696-701).  Dr. Li recorded that Hoyle was "doing ok overall," and that her mood was "stable."  (Tr. 699).  Plaintiff informed Dr. Li that the frequency of her panic attacks had decreased with medication.  (*Id.*).  She stated that she "did feel very anxious when her husband was away for about [two] weeks," but claimed that she "was able to find a way to manage through [it]."  (*Id.*).

On June 28, 2013, Hoyle underwent a Functional Capacity Evaluation at the LBJ General Hospital.  (Tr. 706-13).  During that evaluation, Plaintiff was able to sit for forty minutes consecutively, and ninety-eight minutes, in total; to stand for nine minutes consecutively, and seventeen minutes, in total; to lift items weighing twelve and a half pounds from a standing position, and items weighing seventeen and a half pounds from a squatting position; to push and pull a twenty-five pound sled for twenty-five feet; and to complete a six minute walk test without an assistive device.  (Tr. 709, 711-13).  Musculoskeletal testing revealed "4/5" strength levels in Plaintiff's upper and lower extremities, and a full range of motion in her shoulders, elbows,

wrists, hands, hips, knees, ankles, and feet. (Tr. 708). Her fine and gross motor coordination skills were found to be within normal limits. (Tr. 710). In addition, Hoyle performed eight out of ten consecutive repetitions of overhead reaching from a standing position, and climbed five steps with the use of a handrail. (Tr. 713). It was noted, however, that Plaintiff was "limited with all tasks due to exhibited pain behaviors, weakness, and impaired [body] strength." (*Id.*).

Plaintiff had four appointments at the Strawberry Psychiatry Clinic between July 29, 2013, and September 30, 2013. (Tr. 724-46). Treatment notes from those visits are, for the most part, unremarkable. On July 29, 2013, Hoyle was found to have a "well-groomed" appearance, a "cooperative" attitude, an "ok" mood, an "appropriate[]" affect, "grossly intact" cognition, and "good" judgment. (Tr. 744). On September 24, 2013, Hoyle stated that she was planning to attend a family wedding in Missouri. (Tr. 735). At an appointment on September 30, 2013, Plaintiff reported that her depression and anxiety were "much better," that her mood was "stable," and that her relationship with her husband was "better." (Tr. 729).

Plaintiff saw Dr. Masciangelo for a final time on October 1, 2013. (Tr. 747-54). During that visit, Hoyle reported that her back pain was "more tolerable." (Tr. 752). Treatment notes from that visit reveal that Plaintiff's hypertension, psoriatic arthritis, and sleep apnea symptoms were controlled with medication. (Tr. 753).

On March 11, 2014, Plaintiff returned to the Strawberry Psychiatry Clinic for the last time. (Tr. 809-16). Hoyle reported "various stressors" relating to her family. (Tr. 810). She also reported that she felt "more depressed as of late." (*Id.*). Plaintiff's mood, affect, cognition, judgment, and thoughts were all within normal limits. (Tr. 811). She was prescribed Citalopram, Wellbutrin, and Elavil. (Tr. 812).

Hoyle returned to the LBJ Rheumatology Clinic on April 29, 2014, and on August 28,

18

2014.  (Tr. 845-60).  Treatment notes from the April 29, 2014 appointment indicate "diffuse joint pain" in Plaintiff's hands and elbows, and "muscle stiffness" in her lower back.  (Tr. 853).  At the appointment on August 28, 2014, Hoyle stated that she was "doing ok."  (Tr. 847).  She reported intermittent arthralgia in her elbows and wrists, and "more continuous" arthralgia in her lower back.  (*Id.*).

### Educational Background, Employment History, and Present Age

At the time of the hearing, Hoyle was forty-nine years old, and had completed one semester of college.  (Tr. 31-32).  Her employment history included positions as a claims clerk, a filing clerk, and a finance manager.  (Tr. 33).

### Subjective Complaints

In her application for benefits, Plaintiff alleged that she is unable to work, because of a "lumbar spine impairment," "severe back pain," "degenerative disc disease," and "hypertension." (Tr. 235).  At the hearing, however, Hoyle testified that she is unable to work primarily due to progressively worsening pain and swelling in her hands, lumbar back, hips, ankles, and arms, as well as "constant fatigue."  (Tr. 34-35).   She reported that, due to the pain in her hands, she has difficulty writing, using a keyboard, and opening bottles.  (Tr. 46).  Hoyle stated that she gives herself a weekly Enbrel injection to reduce the inflammation in her joints, and that she takes oral medication as well.  (Tr. 35-36).  Plaintiff told the ALJ that, due to the pain in her joints, she has difficulty standing, walking, and carrying objects.  (Tr. 40-42).  Plaintiff testified that she can only stand in one place for five to ten minutes at a time, and that she can walk only two blocks before she must rest.  (Tr. 40-41).  She further testified that she can carry a half gallon of milk no more than ten feet before she must set it down.  (Tr. 41-42).  Hoyle also reported that she suffers from obstructive sleep apnea.  (Tr. 38-39).  She explained that, as a result of that condition, she

has difficulty falling asleep and "usually [feels] tired" in the morning.  (Tr. 39).  Plaintiff admitted, however, that her condition has improved with the use of a CPAP machine.  (*Id.*).

Plaintiff told the ALJ that she suffers from anxiety and depression, which cause her to have racing thoughts, insomnia, and difficulty concentrating.  (Tr. 42-45).  Hoyle further reported that she suffers from a cognitive disorder, which causes her to have problems with her short-term memory.  (Tr. 45).  She testified that she "get[s] distracted very easily," and that she is unable to read more than three pages of a book at one time.  (Tr. 43-44).  Plaintiff reported that she has difficulty interacting with large groups of people, because she "feels anxious," and "get[s] confused on the different things people are saying."  (Tr. 44-45).

Hoyle reported that she currently lives with her husband.  (Tr. 38).  She stated that, on a typical day, she drives to her church for book club meetings, shops at the grocery store, sorts laundry, watches television, and visits her daughter-in-law and granddaughter at their nearby apartment.  (Tr. 37, 39-41).  Plaintiff told the ALJ that she and her husband usually travel to Dallas every six months to visit her son.  (Tr. 38).  She testified that she recently flew to Missouri to attend a wedding.  (*Id.*).

### *Expert Testimony*

At the hearing, the ALJ also heard testimony from a board certified psychiatrist, Dr. Nancy M. Terran.  (Tr. 47-50).  From her review of the available medical records, as well as from the hearing testimony, Dr. Terran testified that, due to her mental impairments, Hoyle suffered from "mild" restrictions of her activities of daily living; "mild" difficulties in maintaining social function; "moderate" difficulties with maintaining concentration, persistence and pace; and no episodes of decompensation or deterioration. (Tr. 49).  Dr. Terran concluded, however, that Hoyle's condition did not meet or equal any of the listed impairments.  (Tr. 49-50).

The ALJ also heard testimony from Cassandra Humfress, a vocational expert. (Tr. 50-57). Ms. Humfress characterized Hoyle's prior work experience, as a filing clerk and as a claims clerk, as "sedentary," in exertional level, and "semiskilled." (Tr. 51-52). She characterized Hoyle's finance manager position as "sedentary" and "skilled." (Tr. 51). The ALJ then posed the following questions to Ms. Humfress:

> Q  Please assume the following hypothetical individual who has the same age and education as the claimant and as a result of her combination of impairments, such hypothetical individual would [] retain the [RFC] to engage in a sedentary level of exertion . . . except that such individual would be limited to occasional balancing, stooping, kneeling, crouching, crawling, and climbing ramps and stairs, but would never be able to engage in any work-related activities involving ropes and scaffolding; and such individual is limited to occupations which do not require exposure to dangerous machinery and unprotected heights and such individual would mentally be restricted to work . . . such that she'd be able to understand, remember, and carry out detailed, but not complex work; such individual would be able to concentrate for extended periods; such individual would be able to interact with coworkers, supervisors, and [the] public; and such individual would be able to handle changes in a routine work setting. Do you have an opinion regarding whether such hypothetical individual would be able to perform any past relevant work?

(Tr. 51-52). The witness then replied that such a person could perform Plaintiff's past relevant work as a claims clerk or as a filing clerk. (Tr. 53-54).

Plaintiff's representative then posed a series of hypothetical questions to the vocational expert, as follows:

> Q  Assume an individual with claimant's age, education, and past relevant work that is limited to standing and walking less than one hour in an eight-hour workday. Could such an individual perform the claimant's past relevant work?

> A  No.

> Q  What about other jobs? Other sedentary jobs?

> A  There are - - most sedentary jobs require some standing or walking minimally anyway.

21

Q  So the answer is no?

A  Correct.

Q  Assume an individual that could only lift and carry five pounds occasionally, could such an individual perform sedentary work or the past relevant work?

                                    ***

A  Both of those jobs would have less than five pounds to carry.

Q  So that wouldn't have any impact?

A  Sorry, no.

Q  If the individual [] had a marked limitation in grasping, fingering, or reaching and vocationally I'll say that they could only perform those tasks occasionally[,] . . . could such an individual perform the claimant's past relevant work or other sedentary jobs?

A  [T]he claims clerk and the filing clerk both require frequent handling and the filing clerk requires constant handling, but there are other [sedentary] jobs that would be available [] for occasional reaching, handling, and fingering.

Q  Assume . . . also that the individual could only lift and carry five pounds occasionally. . . . Would there be jobs available for such a person with . . . those limitations?

A  Yes, for sedentary work with lifting - - yes.

Q  [A]ssume another limitation of fingering only 20 to 30 minutes, would that have any impact on those other sedentary jobs?

                                    ***

A  [T]here would be other [sedentary] positions with no fingering [available].

***

Q  Assume further that this person would be absent three or more times a month, would there be other sedentary jobs with that limitation?

A  No.

(Tr. 54-56).

### *The ALJ's Decision*

Following the hearing, the ALJ made written findings on the evidence.  (Tr. 11-22).
From her review of the record, she determined that Hoyle suffered from lumbar degenerative
disc disease, psoriatic arthritis, iron deficiency anemia, depression, anxiety, and obesity, and that
those conditions were "severe."    (Tr. 13).    She determined, however, that Plaintiff's
hypertension, sleep apnea, hyperlipidemia, and insomnia were "not severe."  (Tr. 13-14).  The
ALJ further concluded that Hoyle did not have an impairment, or any combination of
impairments, which met, or equaled in severity, the requirements of any applicable SSA Listing.
(Tr. 14-16).  Next, the ALJ assessed Hoyle's RFC, and found that she can "engage in a sedentary
level of exertion as that term is defined in 20 CFR 404.1567(a) except she is limited to
occasional balancing, stooping, kneeling, crouching, crawling, and climbing ramps and stairs but
can never engage in any work activities involving ropes, ladders, and scaffolding."  (Tr. 16).
The ALJ found that Hoyle must avoid "exposure to dangerous machinery and unprotected
heights."  (*Id.*).  She further found that Plaintiff can "understand, remember, and carry out
detailed but not complex work;" that she can "concentrate for extended periods;" that she can
"interact with co-workers, supervisors, and the public;" and that she can "handle changes in a
routine work setting."  (*Id.*).  The ALJ concluded that, while Hoyle's impairments could
reasonably be expected to cause the alleged symptoms, her testimony regarding the intensity,
persistence, and limiting effects of her conditions was "not entirely credible," as it was
inconsistent with the RFC assessment.  (Tr. 18).  The ALJ also concluded that Hoyle's testimony
was inconsistent with the medical evidence of record.  (Tr. 19-20).  Based on the vocational
expert's testimony, the ALJ determined that Hoyle was capable of performing her past relevant
work as a filing clerk, a claims clerk, and a finance manager.  (Tr. 21-22).  Ultimately, she

concluded that Hoyle was not under a "disability," as defined by the Act, and she denied her application for benefit. (Tr. 22). That denial prompted Hoyle's request for judicial review. (*See* Complaint).

In this action, Plaintiff claims that the ALJ's determination, that she is not under a "disability," is not supported by substantial evidence. (Pl.'s Mem. 12-23). Specifically, she argues, first, that the ALJ failed to give sufficient weight to the opinions from her treating physicians, Dr. Chou and Dr. Masciangelo. (*Id.* at 13-15). On this point, she makes two arguments: (i) the ALJ failed to provide "good cause" for rejecting the opinions from Dr. Chou and Dr. Masciangelo; and (ii) the ALJ failed to evaluate those opinions according to the factors set out in 20 C.F.R. § 404.1527(c)(2). (*Id.*). In her second argument, Plaintiff contends that the ALJ's assessment of her RFC is not supported by substantial evidence, because she "did not include a narrative of any specific medical or nonmedical facts that support the RFC determination." (*Id.* at 16-17). Next, Plaintiff argues that the ALJ "failed to properly evaluate" her credibility. (*Id.* at 17-19). Finally, Hoyle contends that, because the ALJ's RFC finding is not supported by substantial evidence, "the [vocational expert]'s testimony in response to a hypothetical based on [that] RFC finding [wa]s unreliable." (*Id.* at 19). In addition, Plaintiff claims that "the ALJ's hypothetical to the vocational expert failed to accurately describe all of [her] mental limitations." (*Id.* at 20).

It is well-settled that judicial review of the Commissioner's decision is limited to the determination of whether it is supported by substantial evidence, and whether the ALJ applied the proper legal standards in making it. *See Copeland v. Colvin*, 771 F.3d 920, 923 (5th Cir. 2014); *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *see generally* 42 U.S.C. § 405(g). Any conflict in the evidence is to be resolved by the ALJ, and not the court. *Copeland*, 771 F.3d

at 923.   A finding of "no substantial evidence" is proper only if there are no credible medical

findings or evidentiary choices that support the ALJ's decision.  *Johnson v. Bowen*, 864 F.2d

340, 343-44 (5th Cir. 1988).

### Treating Physicians' Opinions

Plaintiff first argues that the ALJ failed to properly evaluate the opinions given by her

treating physicians, Dr. Chou and Dr. Masciangelo.  (Pl.'s Mem. 13-15).  The "opinions," which

Plaintiff references, are a Medical Release/Physician's Statement, which was completed by Dr.

Chou on September 16, 2012, and a Multiple Impairment Questionnaire, which was completed

by Dr. Masciangelo on May 10, 2013.  (*See* Tr. 685, 705).  Plaintiff argues that the ALJ should

have given controlling weight to both of those opinions, because they were "based on extensive

clinical and diagnostic testing grounded in the medical record," and because they were not

"[]contradicted by other substantial evidence in the record."  (Pl.'s Mem. 15).

Generally, "the opinions, diagnoses, and medical evidence of a treating physician who is

familiar with the claimant's injuries, treatments, and responses should be accorded considerable

weight in determining disability."  *Perez v. Barnhart*, 415 F.3d 457, 465-66 (5th Cir. 2005).  But

a treating physician's opinion is not dispositive.  *Id.*  Indeed, "the ALJ is free to assign little or no

weight to the opinion of any physician for good cause."  *Holifield v. Astrue*, 402 F. App'x 24, 26

(5th Cir. 2010) (citing *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000)).   "Good cause" for

rejecting a treating source opinion exists if the treating physician's statements are "brief and

conclusory, not supported by medically acceptable clinical laboratory diagnostic techniques, or

otherwise unsupported by the evidence."  *Perez*, 415 F.3d at 466 (quoting *Greenspan v. Shalala*,

38 F.3d 232, 237 (5th Cir. 1994)); *accord Hernandez v. Barnhart*, 202 F. App'x 681, 682-83 (5th

Cir. 2006) ("An ALJ can discount the weight of the opinions of treating physicians relative to the

opinions of others if the treating physician's opinion and diagnosis is unsupported.").  Ultimately, conflicts among the various medical opinions of record are within the purview of the Commissioner, and not the courts, to resolve.  *Selders v. Sullivan*, 914 F.2d 614, 617 (5th Cir. 1990); *see also Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995) (The ALJ has "sole responsibility for determining a claimant's disability status.").

In her written decision, the ALJ expressly considered the opinions from Dr. Masciangelo and Dr. Chou.  (*See* Tr. 20).  She found, however, that neither opinion was "consistent with the evidence of record."  (*Id.*).  In addition, the ALJ underscored that Dr. Chou's opinion did not specify the anticipated duration of Plaintiff's disability.  (*Id.*).

Here, the ALJ had "good cause" to discount Dr. Chou's opinion, because it was unsupported by objective clinical findings.  The Medical Release/Physician's Statement, which Dr. Chou completed, is a single-page form, which consists of boxes and "fill-in-the-blank" answers.  (*See* Tr. 705).  Notably, the information on the form does not contain any explanatory notes, or references to objective medical tests, and it provides no data regarding Plaintiff's medical history or present complaints.  *See Neely v. Barnhart*, 512 F. Supp. 2d 992, 997-98 (S.D. Tex. 2007) (finding that the ALJ did not err by declining to consider a treating physician's opinions, because the forms underlying the opinions "contain[ed] nothing more than conclusory statements," and "fail[ed] to reference any medical records or notes").  On that form, Dr. Chou reported that Hoyle experiences significant functional limitations, due to a history of psoriatic arthritis.  (Tr. 705).  But, as the ALJ correctly pointed out, there is ample conflicting evidence in the record that Hoyle's condition was not as severe as she alleged.  (Tr. 20).  For instance, in January 2012, September 2012, and January 2013, Hoyle's psoriatic arthritis was found to be "doing well."  (Tr. 294, 296, 300).  In addition, the ALJ cited a June 2013 functional capacity

examination, which showed that Plaintiff could sit for forty minutes consecutively, and ninety-six minutes, in total; that she could lift items weighing twelve and a half pounds from standing, and items weighing seventeen and a half pounds from squatting; that she could push and pull a twenty-five pound object for twenty-five feet; and that she could complete a six-minute walk test without an assistive device.  (Tr. 19; *see* Tr. 706-13).  Further, the record suggests that Plaintiff's joint pain increased only when she was noncompliant with her treatment regimen.  (*See* Tr. 310-11, 729).

The ALJ, likewise, had "good cause" to reject Dr. Masciangelo's opinion, because it was contradicted by the other evidence in the record.  For instance, as a purported basis for his opinion that Plaintiff suffers from severe physical impairments, Dr. Masciangelo relied on x-rays of her back, hands, knees, and ankles.  (Tr. 686).  However, x-rays of Hoyle's hands and wrists were all normal, and x-rays of her feet, ankles, and lumbar spine revealed only mild osteoarthritic changes.  (Tr. 298, 302, 345-46).  Further, there are findings detailed in the Multiple Impairment Questionnaire, such as muscle weakness and difficulties with grasping, turning, and twisting objects, which were not mentioned in any of Dr. Masciangelo's prior treatment notes.  (Tr. 688; *see* Tr. 282-95, 762-69).  In fact, on February 8, 2013, just three months before Dr. Masciangelo completed the questionnaire, his treatment notes reflect a normal physical examination, with no indication of functional limitations, or difficulties in daily activities.  (*See* Tr. 762-69).  Indeed, Dr. Masciangelo remarked at the time that Hoyle was having a "relatively good response" to her medications, and he noted that she had a full range of motion and strength in her upper and lower extremities.  (Tr. 767).

On this record then, the ALJ's decision to assign "no weight" to the opinions from Plaintiff's treating physicians is supported by substantial evidence.

### *Analysis of the Newton Factors*

Hoyle also argues that the ALJ erred, by failing to analyze the opinions from Dr. Chou and Dr. Masciangelo according to the factors set forth in 20 C.F.R. § 404.1527(c)(2).   (Pl.'s Mem. 15).

In *Newton v. Apfel*, 209 F.3d 448 (5th Cir. 2000), the Fifth Circuit held that "absent reliable medical evidence from a treating or examining specialist, an ALJ may reject the opinion of the treating physician only if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in [20 C.F.R. § 404.1527(c)(2)]."[3]   *Newton*, 209 F.3d at 453. Under 20 C.F.R. § 404.1527(c)(2), the ALJ must evaluate a physician's opinion based on: (1) the physician's length of treatment of the claimant; (2) the physician's frequency of examination; (3) the nature and extent of the treatment relationship; (4) the support of the physician's opinion afforded by the medical evidence of record; (5) the consistency of the opinion with the record as a whole; (6) and the specialization of the treating physician.   *Id.* at 456; *see* 20 C.F.R. § 404.527(c)(2).   But the ALJ is only required to perform a detailed analysis of the treating physician's opinion, under these so-called "*Newton* factors," if there is no reliable medical evidence from another treating or examining physician that controverts the treating physician's opinion.   *See Newton*, 209 F.3d at 455-57; *Rollins v. Astrue*, 464 F. App'x 353, 358 (5th Cir. 2012).

In this case, the ALJ did not summarily reject the opinion of a treating physician, based upon the conclusions of a non-examining medical expert.   *See Newton*, 209 F.3d at 458.   Instead, in assigning "no weight" to the opinions from Dr. Chou and Dr. Masciangelo, the ALJ relied upon: (1) records indicating that the majority of Hoyle's conditions were controlled with

---

3. The original text in *Newton* refers to "the criteria set forth in 20 C.F.R. § 404.1527(d)(2)," but that section has been renumbered without substantive change to 20 C.F.R. § 404.1527(c)(2).

medication, diet, and lifestyle change; (2) treatment notes that show unremarkable physical examinations; and (3) Hoyle's own reported activities of daily living.  (Tr. 14-20); *see Rollins v. Astrue*, 464 F. App'x 353, 358 (5th Cir. 2012) ("The ALJ's recognition that [the treating physician's] opinion was inconsistent with objective medical findings, other doctor's opinions, and the record as a whole satisfies the [SSA]'s [§ 404.1527(c)] requirement"); *Harrell v. Colvin*, No. 14-55-JJB-RLB, 2015 WL 965745, at *5 (M.D. La. Mar. 4, 2015) (finding *Newton* inapplicable, because the record contained "competing first-hand medical evidence" from "multiple other treating physicians"); *Kim Nguyen v. Colvin*, No. 4:13-CV-2957, 2015 WL 222328, at *11 (S.D. Tex. Jan. 14, 2015).  For that reason, the ALJ was not required to perform a detailed analysis of the § 404.1527(c)(2) factors.

### *RFC Assessment*

Holloway next argues that the ALJ's RFC determination was not supported by substantial evidence, because it "did not include a narrative of any specific medical or nonmedical facts that support [it]."  (Pl.'s Mem. 17).  SSR 96–8p requires that an RFC assessment include "a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (*e.g.,* laboratory findings) and nonmedical evidence (*e.g.,* daily activities, observations)."  SSR 96-8P, 1996 WL 374184, at *7 (Jul. 2, 1996); *see also Bryant v. Astrue*, 272 F. App'x 352, 356 (5th Cir. 2008).  Further, the ALJ's RFC assessment "must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis . . . and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record."  *Id.*

In this case, although Plaintiff contends that the ALJ failed to comply with SSR 96-8P, she cites nothing in the record to explain how the ALJ's conclusions were deficient, nor does she

point to any specific evidence that the ALJ did not consider.  (*See* Pl.'s Mem. 16-17).  And, in

making her RFC determination, the ALJ specifically addressed Hoyle's ability to sit, stand, walk,

lift, bend, and squat.  (*See* Tr. 16-19).  In addition, she addressed the frequency with which

Hoyle could perform those activities during an eight-hour workday.  (*Id.*).  For that reason, the

ALJ's RFC determination was in accordance with SSR 96-8P and supported by substantial

evidence.

### *Credibility Assessment*

Before this court, Hoyle claims that the ALJ erred in assessing her credibility.  (Pl.'s

Mem. 17-19).  Plaintiff contends, in particular, that the ALJ "fail[ed] to cite any medical

authority that the lack of particular physical findings are incompatible with [] Hoyle's disabling

medical conditions."  (*Id.* at 18).  Plaintiff argues further that the ALJ relied, in part, on irrelevant

evidence to make her credibility assessment.  (*Id.*).

In making a disability determination, the ALJ "must consider a claimant's subjective

symptoms."  *Wingo v. Bowen*, 852 F.2d 827, 830 (5th Cir. 1988); *Wren*, 925 F.2d at 128.

However, there is no question that an ALJ has discretion to weigh the credibility of the testimony

presented, and that her judgment on that issue is entitled to considerable deference.  *See Villa v.

Sullivan*, 895 F.2d 1019, 1024 (5th Cir. 1990); *Hollis v. Bowen*, 837 F.2d 1378, 1385 (5th Cir.

1988).  In fact, an ALJ is free to accept or reject a claimant's subjective statements, so long as his

reasons for doing so are made clear.  *See Falco*, 27 F.3d at 164.

At the hearing, Hoyle told the ALJ that, on an average day, she experiences constant pain

in her hands, arms, legs, hips, and lumbar back, as well as fatigue, depression, and anxiety.  (Tr.

34-36, 42-45).  She also reported that she can stand for only ten minutes at a time, and that she

can walk for only ten to twenty minutes at a time.  (Tr. 40-41).  Hoyle told the ALJ, as well, that

she is unable to carry a plate of food or glass of water for any significant distance, and that she is unable to write or to use a keyboard. (Tr. 42). Plaintiff further testified that she suffers from anxiety and depression, and that those conditions cause her to have problems with concentration, focus, memory, and social interaction. (Tr. 42-45).

In her written decision, the ALJ expressly referenced Plaintiff's subjective complaints of pain. (Tr. 17). Nevertheless, the ALJ concluded that Hoyle's "statements concerning the intensity, persistence, and limiting effects of [her] symptoms [we]re not entirely credible." (*Id.*). In particular, the ALJ underscored that there was no evidence that Hoyle "required hospitalization, received emergency room treatment, or experienced a significant reduction in functional ability" at the time of her alleged onset date. (*Id.*). The ALJ also referred to that medical evidence, which suggested that the majority of Hoyle's symptoms were controlled with medication, diet, and lifestyle change. (Tr. 18-20). She also pointed to Hoyle's own testimony, that she regularly drives to church, goes grocery shopping, cooks, does laundry, and travels to Dallas to visit her son. (Tr. 15; *see* Tr. 37-41). In addition, the ALJ pointed to evidence that Plaintiff was often non-compliant with her treatment. (Tr. 18-19); *see Robinson v. Astrue*, No. H-09-2497, 2010 WL 2606325, at * 8 (S.D. Tex. Jun. 28, 2010) ("A claimant's non-compliance with treatment is a proper factor for the ALJ to consider in assessing credibility."); *see also Villa*, 895 F.2d at 1024.

Here, it is clear that the ALJ considered both subjective and objective evidence in assessing Plaintiff's credibility. *See Wingo*, 852 F.2d at 830. Further, in questioning Hoyle's credibility, she expressly referenced the objective medical evidence. *See Falco*, 27 F.3d at 164. As a result, the ALJ complied with the law in weighing Hoyle's credibility, and her decision is, therefore, entitled to considerable deference. *See Villa*, 895 F.2d at 1024; *Hollis*, 837 F.2d at

1385.

### Step Five Determination

Finally, Hoyle argues that the ALJ erred at step five of her analysis, when she concluded that Plaintiff could return to her past relevant work.  (Pl.'s Mem. 19-22).  First, she complains that the hypothetical questions that the ALJ posed to the vocational expert witness did not include her finding that Hoyle has "moderate difficulties in concentration, persistence, and pace."  (*Id.* at 20).  It is true that, to support a non-disability finding, any hypothetical question that is posed to the vocational expert witness must "incorporate reasonably all disabilities of the claimant [that are] recognized by the ALJ," and that are supported by the objective medical evidence.  *Boyd v. Apfel*, 239 F.3d 698, 707 (5th Cir. 2001); *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994).  And if hypothetical questions posed to the vocational expert witness do not fairly encompass all of the claimant's limitations, then the witness's response does not constitute substantial evidence to support the ALJ's decision.  *See Boyd*, 239 F.3d at 707 (citing *Bowling*, 36 F.3d at 436).  In this case, however, there is no objective medical evidence to support the contention that Plaintiff's concentration is so impaired as to impede her ability to work.  Because the evidence does not support that subjective complaint, the ALJ had no duty to include such a limitation in her hypothetical questions to Ms. Dumfress.  *See Boyd*, 239 F.3d at 707.

As a final matter, Hoyle argues that, because the ALJ failed to properly evaluate her RFC, her step five determination is not support by substantial evidence.  (Pl.'s Mem. 19).  However, as discussed above, the ALJ's RFC determination was, in fact, supported by substantial evidence.  For that reason, there is no need to address that argument.  *See Renfrow v. Colvin*, No. 3:14-CV-01922-CAN, 2016 WL 286418, at *6 (N.D. Ind. Jan. 25, 2016).

**IV. Conclusion**

Accordingly, it is **ORDERED** that Defendant's motion for summary judgment is **GRANTED**, and that Plaintiff's motion for summary judgment is **DENIED**.

This is a **FINAL JUDGMENT**.

The Clerk of the Court shall send copies of the memorandum and order to all counsel of record.

**SIGNED** at Houston, Texas, this 29th day of March, 2016.

**MARY MILLOY**
**UNITED STATES MAGISTRATE JUDGE**